SARA AZARI (SBN 237987)
LAW OFFICE OF SARA AZARI
849 S. Broadway, Suite 1107
Los Angeles, California 90014
Telephone: (213) 622-5000
Facsimile: (213) 254-0555
Email: sara@azarilaw.com

VICTOR SHERMAN (SBN 38483)
LAW OFFICES OF VICTOR SHERMAN
11400 W. Olympic Boulevard, Suite 1500
Los Angeles, California 90064
Telephone: (424) 371-5930
Facsimile (310) 392-9029
Email: victor@victorsherman.law

Attorneys for Defendant
TYLER BUCHANAN

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>TYLER BUCHANAN,<br>Defendant. | Case No. 2:24-cr-00595-JWH<br><br>**DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM AND RESPONSE TO GOVERNMENT'S SENTENCING POSITION [DKT. 221]; EXHIBIT E**<br><br>Date: November 17, 2026<br>Time: 2:00 p.m.<br>Court: Honorable John W. Holcomb |

Defendant TYLER BUCHANAN, by and through his attorneys Sara Azari and Victor Sherman, submits this Supplemental Sentencing Memorandum. It (1) amends Section III of his Sentencing Memorandum (Dkt. 220) to reflect the guideline amendments that took effect on November 1, 2026; (2) joins the Probation Office's revised recommendation of 60 months (Dkt. 234); (3) responds to the Government's Sentencing Position (Dkt. 221); and (4) submits the Digital Asset Expert Report of Guidepost Solutions LLC as Exhibit E. This supplement is based

on the files and records of this case, the Revised Presentence Investigation Report (Dkt. 235) and its Addendum (Dkt. 236), and the exhibits previously filed, Exhibit E, and such argument as the Court may permit at the hearing.

Dated: November 9, 2026 Respectfully submitted,

LAW OFFICE OF SARA AZARI

By *\/s/Sara Azari*
SARA AZARI
Attorney for Defendant
TYLER BUCHANAN

LAW OFFICES OF VICTOR SHERMAN

By */s/Victor Sherman*
VICTOR SHERMAN
Attorney for Defendant
TYLER BUCHANAN

# I.

# INTRODUCTION

The parties now agree on the advisory range. On November 1, 2026, the Sentencing Commission's inflation adjustment to the Loss Table in U.S.S.G. § 2B1.1(b)(1) took effect. Tyler Buchanan's Total Offense Level is 24, not 26. His advisory range on Count 1 is 51 to 63 months. The government agrees. (Dkt. 221 at 1, 6–7.) So does the Probation Office, which has revised the Presentence Report to apply the amended table. (PSR ¶¶ 45, 59, 108 (Dkt. 235); PSR Addendum at 1–2 (Dkt. 236).)

The parties disagree about what to do with that range. The government asks for 63 months on Count 1. That is the top of the amended range. It is also the exact bottom of the range the Commission has just retired. The government's recommendation leaves Tyler with none of the benefit of the amendment.

The Probation Office has now revised its recommendation to account for the amendment. It recommends 36 months on Count 1, followed by the mandatory consecutive 24 months on Count 3, for a total of 60 months. (Revised Recommendation Letter at 2, 8 (Dkt. 234); PSR Addendum at 2 (Dkt. 236).) The defense joins that recommendation. Probation recalculated the range, reweighed the same mitigating factors, and again concluded that a sentence below the range is warranted. Its recommendation moved with the range. The government's did not.

The government's case for more time rests on three claims: that Tyler was a principal member of the group who profited from it; that his conduct was "driven entirely by greed"; and that he continued offending, "unabated," after Scottish authorities seized his devices in April 2023. (Dkt. 221 at 2, 10, 14.) The Guidepost report, prepared by a former FBI special agent who spent two decades investigating cryptocurrency fraud, answers the first two with the government's own blockchain data. The third misreads what April 2023 was and what followed it.

## II.

## AMENDED GUIDELINES CALCULATION (AMENDING SECTION III OF THE SENTENCING MEMORANDUM)

### A. The November 1, 2026 Guidelines Manual Governs This Sentencing

The Court applies the Guidelines Manual in effect on the date of sentencing. 18 U.S.C. § 3553(a)(4)(A)(ii); U.S.S.G. § 1B1.11(a). The only exception is where the current Manual would produce a higher range than the Manual in effect when the offense was committed, which would raise ex post facto concerns. *Peugh v. United States*, 569 U.S. 530, 533 (2013). Here, the amendment lowers the range. Sentencing is set for November 17, 2026. The 2026 Manual controls.

When Tyler filed his Sentencing Memorandum on September 17, 2026, the hearing was set for October 1, before the amendment's effective date. Section III of that memorandum therefore asked the Court to treat the pending amendment as instructive rather than binding. That argument is now moot. The amended Loss Table is no longer a policy argument. It is the law that governs the calculation, and Section III is amended accordingly.

The amendment adjusts the monetary thresholds of the Loss Table for inflation. Under the amended table, the 18-level increase applies to losses of more than $5,000,000 (previously $3,500,000), and the 20-level increase applies to losses of more than $15,000,000 (previously $9,500,000). U.S.S.G. § 2B1.1(b)(1)(J)–(K) (Nov. 1, 2026). The PSR places the loss at $14,547,173.52. (PSR ¶¶ 35, 37, 45; Dkt. 221 at 7.)[1] That figure falls within § 2B1.1(b)(1)(J). The corrected calculation is:

| | |
|---|---|
| Base Offense Level [§§ 2X1.1, 2B1.1(a)(1)] | 7 |
| Specific Offense Characteristics: | |
| More than $5,000,000 [§ 2B1.1(b)(1)(J) (Nov. 1, 2026)] | +18 |

[1] Tyler's Sentencing Memorandum reported the PSR loss figure as $14,547,163.52. The sum of the losses to the four victim companies ($2,938,590) and to the 32 individual victims ($11,608,583.52) is $14,547,173.52, as the government reports. (Dkt. 221 at 7.) The ten-dollar difference was typographical and does not affect the calculation.

| | |
|---|---|
| Number of Victims [§ 2B1.1(b)(2)(A)] | +2 |
| Sophisticated Means [§ 2B1.1(b)(10)(C)] | +2 |
| Acceptance of Responsibility [§ 3E1.1(a), (b)] | -3 |
| Zero-Point Offender [§ 4C1.1(a)] | -2 |
| **Total Offense Level** | **24** |
| Criminal History Category | I |
| **Advisory Guideline Range, Count 1** | **51–63 months** |
| Requested Sentence, Count 1 | 36 months |
| Count 3, Consecutive [18 U.S.C. § 1028A(a)(1), (b)(2)] | 24 months |
| **Requested Aggregate Sentence** | **60 months** |

The defense has no other objection to the factual content or guideline computations in the PSR. Probation has since revised the PSR to apply the amended table, and its calculation matches the one above. (PSR ¶¶ 40, 45, 54, 58, 59, 108 (Dkt. 235); PSR Addendum at 1–2 (Dkt. 236).) The defense asks the Court to adopt it.

### B. The Amendment Reflects the Commission's Judgment About Culpability and Should Carry Its Full Weight

The Commission did not adjust the table for administrative reasons. It found that inflation had eroded the value of the dollar, so that a given loss amount now reflects a lower degree of harm and culpability than it did when the table was last adjusted in 2015.[2] In other words, the Commission has concluded that the superseded table overstated the seriousness of losses in Tyler's bracket by two offense levels.

That conclusion matters because the Guidelines anchor the sentence. They are "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The district court must begin with a correctly calculated range and keep it in

[2] U.S. Sentencing Comm'n, *Amendments in Brief: Inflationary Adjustments* (effective Nov. 1, 2026), https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_2026-inflation-final.pdf

view throughout. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc); *see also Molina-Martinez v. United States*, 578 U.S. 189, 198–200 (2016). When the anchor moves, the sentence should move with it.

**C. The Government's 63-Month Recommendation Erases the Amendment**

Under the superseded table, 63 months was the lowest sentence within the range. Under the table that now governs, the government asks for the highest. The practical effect is to sentence Tyler as if the Commission had never acted.

The government offers no reason for a top-of-range sentence that the offense level does not already capture. Its "nature and circumstances" argument recites the size of the loss, the number of victims, and the sophistication of the scheme. (Dkt. 221 at 9–11.) Those are the facts that produce Level 24: 18 levels for loss, two for the number of victims, and two for sophisticated means. Counting them again to push the sentence to the top of the range gives them double the weight.

**D. Probation Has Revised Its Recommendation to Reflect the Amended Range**

Probation originally recommended 42 months on Count 1, a 21-month variance from the bottom of the superseded 63-to-78-month range. Its reasons were Tyler's youth, his early social isolation and dependence on computers and online activity, his untreated anxiety, his substance abuse, his status as a first-time, non-violent offender, and the punitive character of his eleven months in a Spanish prison. (PSR ¶ 125 (Dkt. 235); Revised Recommendation Letter at 7–8 (Dkt. 234).) None of those factors depends on the Loss Table, and none has changed.

Probation has now applied those same factors to the correct range. Its revised recommendation is 36 months on Count 1, a 15-month variance from the bottom of the amended range, followed by the mandatory consecutive 24 months on Count 3, for a total of 60 months. (Revised Recommendation Letter at 2, 8 (Dkt. 234).) Probation again found that the variance recognizes the time Tyler spent incarcerated in Spain, and that it should be greater than the variances recommended for his co-

defendants. (Id. at 8.) The defense joins the revised recommendation. Nothing in the government's submission justifies exceeding it.

## III.

## THE GUIDEPOST REPORT (EXHIBIT E)

The defense retained Guidepost Solutions LLC to analyze the government's cryptocurrency tracing. The analysis was conducted by Stephanie Talamantez, a Senior Managing Director at Guidepost. Before joining Guidepost, Ms. Talamantez served more than twenty years as an FBI Special Agent specializing in complex financial fraud and cryptocurrency investigations. She led operations that resulted in more than $350 million in asset seizures identified through cryptocurrency tracing, and she holds certifications from Chainalysis, TRM Labs, and ACAMS. (Ex. E at 4 & App. A.)[3]

Ms. Talamantez reviewed the government's discovery, including the FBI's tracing report of February 13, 2025, the FBI's tracing analytics for the individual victims, wallet exports, and Binance data. She then performed her own on-chain analysis using Chainalysis software. (Ex. E at 3, 5–6.) She did not challenge the government's attribution of wallets to Tyler. Where she could not independently confirm an attribution, she said so and accepted the government's. (*Id.* at 6 nn.4–6.) Her findings therefore rest on the government's own data and the government's own assumptions.

### A. Tyler Received a Small Fraction of the Stolen Funds

Guidepost traced the funds taken from Victims 1 through 29, the individual victims named in the First Superseding Indictment. Of those funds, $1,761,758.74 reached wallets the government attributes to Tyler, in twenty transactions between October 3, 2021 and December 19, 2022. (Ex. E at 6 & App. B.) That is roughly 15

[3] Exhibit E is lodged conditionally under seal, with an application under Local Rule 79-5, because it identifies individual victims and lists their cryptocurrency transactions and wallet addresses.

percent of the $11.6 million in cryptocurrency the PSR attributes to the conspiracy, and roughly 12 percent of the total $14.5 million loss.[4]

The defense does not dispute the loss figure. Under the relevant-conduct rules, the full jointly undertaken loss drives the offense level, and Tyler accepted that in his plea. But § 3553(a) asks a different question: what this defendant did and what this defendant deserves. The government calls Tyler a "principal member" who played a "central role." (Dkt. 221 at 2, 10.) The money shows that most of the stolen funds went elsewhere, to wit, wallets other than those attributable to Tyler.

The government's own brief confirms this. It "expects that most, if not all, of the victims will be made whole through funds seized from other co-defendants." (Dkt. 221 at 14.) Proceeds sufficient to make the victims whole were found in other people's hands. A loss figure aggregated across a multi-defendant scheme can overstate any one participant's culpability, and the Court may account for that under § 3553(a). *See United States v. Adelson*, 441 F. Supp. 2d 506, 509–12 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).

**B. The Blockchain Corroborates Tyler's Gambling Compulsion**

The government brushes aside Tyler's gambling. It says he "purportedly gambled away the proceeds" and that his conduct was "driven entirely by greed." (Dkt. 221 at 14.) One page earlier, the government concedes that his social anxiety, online gambling, and "unhealthy attachment to the online world" "almost certainly contributed to the offense conduct." (*Id.* at 13.) The two positions cannot both be right. Conduct that a compulsion "almost certainly" helped drive was not driven "entirely" by greed.

---

[4] Guidepost traced Victims 1 through 29 only, because they are the individual victims named in the First Superseding Indictment. (Ex. E at 5 n.2.) The PSR counts 32 individual victims. The comparison is offered to show scale, not as an alternative loss calculation. If anything, the $1.76 million figure overstates what Tyler received. Approximately $990,000 of it, the Victim 1 transfers, passed through an address that later sent funds to the ChipMixer mixing service, and Guidepost attributed that address to Tyler only by accepting the government's assertion. (*Id.* at 6 n.4.)

Guidepost's tracing shows what that compulsion looked like. From wallets the government attributes to Tyler, Guidepost documented 492 separate deposits, totaling roughly $5 million, to three offshore cryptocurrency casinos: Gamdom, Stake, and Rollbit, each operated out of Curaçao. (Ex. E at 7–9 & Apps. C–H.)[5] Nearly 400 of those deposits were made in the 23 months between May 2021 and April 2023, more than one every two days. Tyler also withdrew funds from the platforms back to his own wallets more than 100 times, then staked them again. (*Id.* at 7, 10–11 & App. I.)

That is what compulsive gambling looks like on a blockchain. The money did not sit in an account. It cycled, again and again, through casino platforms, in deposits that together amounted to roughly three times the victim funds traced to Tyler. Guidepost does not claim to trace every dollar to its final destination, and the defense does not claim that every dollar was lost at the tables. What the data show is the pattern: hundreds of transactions, sustained over nearly two years, consistent with the account Tyler gave Probation and Dr. Whiting.

That pattern also matches Probation's own findings. The Probation Officer identified "compulsive gambling" as part of the pattern that accompanied Tyler into young adulthood and noted that he has never received treatment for it. (Recommendation Letter at 7–8.) Unlike the "gaming disorder" Dr. Whiting discusses, gambling disorder is a recognized diagnosis, classified in the DSM-5-TR alongside the substance-use disorders. Exhibit E does not excuse what Tyler did. It shows that the government's explanation of why he did it, greed and nothing else, is dismissive and incomplete.

---

[5] The report's summary tables place the total deposits at approximately $5.35 million. (Ex. E at 9.) Guidepost's transaction-level appendices sum to approximately $4.99 million. (*Id.*, Apps. C–H.) The difference does not affect the analysis.

## IV.

## RESPONSE TO THE GOVERNMENT'S REMAINING ARGUMENTS

### A. The Post-April 2023 Conduct

The government's most serious contention is that Tyler "continued his criminal activity unabated" after Scottish authorities seized his devices in April 2023. (Dkt. 221 at 10.) The defense does not ask the Court to disregard the April 2024 Telegram messages the government has submitted. It asks the Court to weigh them accurately.

*First*, the government's own language is careful. It says Tyler "appears to have continued committing phishing attacks and attempted intrusions." (*Id.* at 5.) It identifies no completed intrusion, no new victim, and no dollar of loss after April 2023. Its own statement of facts dates the offense conduct "[f]rom at least September 2021 through at least April 2023." (*Id.* at 2.) Every transaction in which Tyler received victim funds took place between October 2021 and December 2022. (Ex. E, App. B.) And more than 99 percent of the value Tyler deposited to the gambling platforms moved before May 2023. (*Id.*, Apps. C–H.) Whatever the April 2024 messages show, the financial record of the scheme had effectively ended a year earlier.

*Second*, April 2023 did not deliver the message the government assumes. Tyler was arrested at an airport in Spain, in front of his family, as they left for a trip to Portugal. Officers seized his computers and questioned him about what he understood to be an unrelated bank-fraud matter, and then released him. No charge followed. He did not know that the Scottish authorities had turned his devices over to federal investigators in the United States. (Sentencing Mem., Section IV.E.)

*Third*, the months that followed were not a calculated decision to defy the law. They were a collapse. Two months before that arrest, men with a machete forced their way into Tyler's apartment, held the blade to his neck, and burned him with a blowtorch until he transferred cryptocurrency to them. He spent more than a week in the hospital. (PSR ¶¶ 79–80.) For the next year he moved between hotels, short-term rentals, and Airbnbs because he believed the men would find him again. He smoked

marijuana heavily. From June to December 2023 he took Adderall bought online that kept him awake for days at a stretch. His weight fell from roughly 280 pounds to 180. He kept gambling. (PSR ¶ 88; Sentencing Mem., Section IV.E.) He was twenty-one years old and had never received treatment of any kind.

None of that excuses the April 2024 messages. It does explain them, however. They are the conduct of a traumatized, addicted, untreated young man in free fall, not of a hardened offender weighing the risk of capture. The intervention that mattered came in May 2024, when Tyler was arrested. He has been in custody ever since, for nearly two and a half years, and the government identifies nothing after his arrest.

**B. Deterrence**

The government's general-deterrence argument is not about Tyler. It cites national statistics on phishing complaints and data-breach losses reported to the FBI's Internet Crime Complaint Center. (Dkt. 221 at 11–12.) Those figures would support the same sentence for any cyber defendant in any case. Section 3553(a) requires an individualized sentence. *Gall*, 552 U.S. at 50; *Pepper v. United States*, 562 U.S. 476, 487–88 (2011). The government's authorities do not change that. They are out-of-circuit decisions involving different offenses, one of them a tax prosecution. (Dkt. 221 at 12.)

The government is correct that cyber offenses are hard to detect. But the research on deterrence points to certainty of punishment, not severity. The Department of Justice's own National Institute of Justice reports that "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment," and that increasing the severity of punishment "does little to deter crime."[6] Tyler was identified, arrested abroad, and pleaded guilty towards a conviction upon sentencing. A 60-month federal sentence, served after eleven months in a Spanish prison, sends the message the

[6] Nat'l Inst. of Justice, U.S. Dep't of Justice, *Five Things About Deterrence* (May 2016), https://nij.ojp.gov/topics/articles/five-things-about-deterrence.

government wants sent. The additional 27 months it seeks would add punishment without adding measurable deterrence.

Specific deterrence points the same way. Tyler is a zero-point offender. He has never before been confined. He was nineteen when the offense began. The Commission has recognized that cognitive development continues into the mid-twenties, that it affects behavior and culpability, and that criminal behavior declines with age. U.S.S.G. § 5H1.1, p.s. (Nov. 1, 2024); U.S.S.G. Supp. to App. C, Amend. 829 (Nov. 1, 2024) (Reason for Amendment); Amendments to the Sentencing Guidelines, 89 Fed. Reg. 36,853, 36,859–60 (May 3, 2024). By the time he is released on a 60-month sentence, Tyler will be past that developmental window, sober, treated, and older than the age at which offending peaks.

His status as a noncitizen also makes each month in custody heavier than the same month served by a citizen. If Tyler is subject to a final order of removal, he cannot apply First Step Act time credits toward earlier release to supervision or prerelease custody. 18 U.S.C. § 3632(d)(4)(E)(i). Immigration detainees are also excluded from the early-release incentive of the Bureau of Prisons' Residential Drug Abuse Program. 28 C.F.R. § 550.55(b)(1). Tyler will very likely serve more of his sentence than a similarly situated citizen. When it ends, he will be removed from the United States.

**C. History and Characteristics**

The government acknowledges real mitigation: a physically and emotionally abusive father, a highly unstable home, social anxiety, online gambling, and an unhealthy attachment to the online world that began when Tyler was twelve. (Dkt. 221 at 13.) It then recasts his high school diploma, his game-development certificate, and his mother's support as "advantages" he squandered. (*Id.* at 13–14.)

Those are not aggravating facts. They are the protective factors that predict success after release. Probation found that Tyler's technical abilities "could potentially be redirected toward lawful and productive employment with appropriate structure,

treatment, and supervision." (Recommendation Letter at 7–8.) Dr. Whiting reached the same conclusion and set out the treatment Tyler needs. (Ex. A.) A sentence that gets Tyler to that treatment sooner serves § 3553(a)(2)(D). A longer one delays it.

The government also faults Tyler for making no contribution to the victims. (Dkt. 221 at 14.) He has been in custody, in Spain and then at MDC–Los Angeles, since May 2024. He will be subject to a restitution order, and he accepts it. And by the government's own account, the victims are expected to be made whole from funds seized from others. (*Id.*)

**D. Unwarranted Disparity and the Unrebutted Spanish Confinement**

The government agrees that Tyler should receive less than the 120 months imposed on co-defendant Noah Urban. (Dkt. 221 at 13.) That concession reflects a judgment about relative culpability. The Guidepost data support it, and the sentence should reflect it in full. 18 U.S.C. § 3553(a)(6).

Finally, the government does not address the conditions of Tyler's eleven months in Spain. He was held without access to his United States counsel, without an interpreter, without access to the evidence against him, and with a single family visit. (Sentencing Mem., Section VI.) Probation again relied on that confinement in recommending a greater variance for Tyler than for his co-defendants. (Revised Recommendation Letter at 8 (Dkt. 234).) That argument stands unrebutted. And the record on credit is now settled. The revised PSR now reflects the government's representations that Tyler was held in Spain from May 31, 2024 until his surrender on April 22, 2025 solely on the United States' extradition request, that he was not charged with or sentenced for any offense in Spain, and that no part of that time has been credited toward any other sentence. (PSR at 1 & n.1 (Dkt. 235); PSR Addendum at 1 (Dkt. 236).) The defense renews its request that the Court (1) find that Tyler has been in continuous custody on this matter since May 31, 2024, solely on the basis of the United States' extradition request, and recommend that the Bureau of Prisons credit

that period under 18 U.S.C. § 3585(b); and (2) state on the record that the variance on Count 1 rests in part on the conditions of that confinement, not its duration.

## V.

## CONCLUSION

The Commission has lowered the advisory range, and the parties agree on the new calculation. The government's recommendation would erase that change. Probation's revised recommendation gives it effect. The Guidepost report shows that Tyler received a small fraction of the stolen funds and that the blockchain record of his conduct reflects a compulsion, not greed alone.

For these reasons, and those set forth in his Sentencing Memorandum and its exhibits, Tyler Buchanan respectfully asks the Court to adopt the Probation Office's revised recommendation and impose a sentence of 36 months on Count 1 and the mandatory consecutive 24 months on Count 3, for a total of 60 months' imprisonment, followed by three years of supervised release. That sentence is "sufficient, but not greater than necessary," to accomplish the purposes of 18 U.S.C. § 3553(a)(2).

Dated: November 9, 2026

Respectfully submitted,

LAW OFFICE OF SARA AZARI

By *_/s/Sara Azari_*
SARA AZARI
Attorney for Defendant
TYLER BUCHANAN

LAW OFFICES OF VICTOR SHERMAN

By *_/s/Victor Sherman_*
VICTOR SHERMAN
Attorney for Defendant
TYLER BUCHANAN